UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALANA CIMILLO,                                    Case No. 7:21-cv-09132-VB

                          *Plaintiff*,

          -against-

AFFIRM, INC., and EXPERIAN
INFORMATION SOLUTIONS, INC.,

                          *Defendants*.


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO
EXPERIAN INFORMATION SOLUTION, INC.'S MOTION TO COMPEL
ARBITRATION AND STAY THIS ACTION**


LAW OFFICE OF ADAM G. SINGER, PLLC
One Grand Central Place
60 East 42nd Street, Suite 4600
New York, NY 10165
212.842.2428


ROBERT S. SOLA, P.C.
1500 SW First Avenue, Suite 800
Portland, OR 97201
503.295.6880


*Counsel for Plaintiff*
*Alana Cimillo*

## Table of Contents

INTRODUCTION ................................................................................................. 1

FACTS .............................................................................................................. 2

    Plaintiff Becomes the Victim of Identity Theft ............................................... 2

    Plaintiff Sends Disputes to Experian ............................................................. 3

    Experian Participates Extensively in the Litigation for More Than Nine Months ............ 4

    Plaintiff's Claims ....................................................................................... 8

ARGUMENT ...................................................................................................... 8

I. Experian Has Waived Any Right to Seek Arbitration ............................................. 8

    A. The Issue of Litigation Waiver Is for the Court ……………………………………8

    B. Experian Waived Any Right to Arbitrate Through Its Long Delay

    in Seeking Arbitration and the Amount of Litigation Conducted…………………………8

        1. Experian Delayed for More Than Nine Months………………………………9

        2. Experian Has Participated in Substantial Litigation…………………………11

II. The Arbitration Provision Does Not Apply to Plaintiff's FCRA Claims …………............... 14

    A. The Arbitration Provision Only Applies to Disputes and Claims
       "Directly Related to the Services or Websites" …………………………………14

    B. The Arbitration Provision Should Be Interpreted Narrowly…………………………..19

III. The FAA Does Not Apply and the Court Cannot Compel Arbitration under It ....................... 22

    A. The Court Determines if the FAA Applies to Plaintiff's Claims…………………………..22

    B. Because the FAA Does Not Apply, the Court Cannot Compel Arbitration ………………24

IV. The Arbitration Provision in the July 28, 2022 Agreement Does Not Apply …………………24

CONCLUSION ................................................................................................25

**Table of Authorities**

**Statutes**

Fair Credit Reporting Act, 15 U.S.C. § 1681 et. seq. ("FCRA")……………….....…..……..…….1

Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA")…………………….……….....…..……22

New York Gen. Bus. Law §§ 380-f and 380-j ("NY FCRA")………………………..…….…….1

**Cases**

*Apple & Eve, LLC v. Yantai N. Andre Juice Co.*, 610 F. Supp. 2d 226, 230 (E.D.N.Y. 2009) …..8

*Borecki v. Raymours Furniture Co.,* No. 17-cv-1188 (LAK), 2017 U.S. Dist. LEXIS 196048 at *5 (S.D.N.Y. November 28, 2017)……………………………………………..………..21

*Brightpoint, Inc. v. Zurich Am. Ins. Co.*,  No. 1:04-CV-2085-SEB-JPG, 2006 U.S. Dist. LEXIS 26018, at *20 (S.D. Ind. Mar. 10, 2006)…………………………………..………………..19

*Casella v. Equifax Credit Information Services*, 56 F. 3d, 469 (2d Cir. 1995)……………...16, 18

*Cheng v. HSBC Bank USA, N.A.,* 467 F. Supp. 3d 46, 50 (E.D.N.Y. June 15, 2020)……….20, 21

*Christus Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 536 (Tex. 2016)…………………….19

*Clark v. Experian Info. Sols., Inc.*, No. 8:20-cv-02122 (C.D. Cal.)……………………………...10

*Coronel v. Bank of America, N.A.*, Case No. 19-8492 (ES) (MAH), 2022 U.S. Dist. LEXIS 147116, at *12 (D.N.J. August 17, 2022)……………………………………………………...12

*Craig v. Discover Bank*, No. 21-CV-1407 W (AGS), 2022 U.S. Dist. LEXIS 105524 (S.D. Cal. June 13, 2022)……………………………………………………………………………………25

*Granite Rock Co. v. Int'l Bd. Of Teamsters,* 561 U.S. 287, 297 (2010)……………...…………14

*Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999)…………………………………..9

*Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991)…………………………………………...12

*Lok v. Experian Info. Sols., Inc.*, No. 7:21-cv-00154 (S.D.N.Y.)…………………………………...10

*Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d. Cir. 2010)…………………………………………………………...…..9, 10, 11

*Matthews v. Experian Info. Sols., Inc.*, No. 2:21-cv-01089 (E.D. Pa.)…………..……………….10

*McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189, 191 (S.D.N.Y. 1985)…….....………….21

*Meeks v. Experian Info. Sols., Inc.*, No. 21-cv-03266-VC, 2021 WL 3878734 (N.D. Cal. Aug. 31, 2021)…………………………………………………………………………………………10

*Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80-81 (2d Cir. 2017)……………………………………8

*Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1712-14 (2022)………………..……………..9

*New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 202 L.Ed.2d 536 (2019)…………………22, 23, 24

*Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597, 612-15 (S.D.N.Y. 2020)…………8

*PPG Industries, Inc. v. Webster Auto Parts, Inc*., 128 F.3d 103, 108 (2d Cir. 1997).9, 10, 11, 12

*Sauer v. Experian Info. Sols., Inc*., No. 8:21-cv-00963 (C.D. Cal.)………………………………10

*Soriano v. Experian Info. Sols., Inc., 2022 U.S. Dist. LEXIS 185783 at \*7-9 (M.D. Fla. Oct. 11, 2022)*………………………………………………………………………………………………14

*Spokeo, Inc. v. Robins, 578 U.S. 330, 342 2016*………………………………………………………22

*TransUnion LLC v. Ramirez, 141 S. Ct. 2190 (2021)*…………………………………………16, 18

## INTRODUCTION

Plaintiff Alana Cimillo ("Plaintiff") has brought claims under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et. seq. ("FCRA") and the New York Gen. Bus. Law §§ 380-f and 380-j ("NY FCRA") against Experian Information Solutions, Inc. ("Experian"), a consumer reporting agency, for actions in violation of these statutes (for convenience, Plaintiff's claims are referred to collectively as her "FCRA claims").

After litigating Plaintiff's case in this Court for nine months, Experian has now filed a Motion to Compel Arbitration ("Motion") seeking to have the case moved to binding arbitration with a private agency based on an arbitration provision in an agreement with a different company, ConsumerInfo.com (also known as Experian Consumer Services or "ECS").

The Motion should be denied for several reasons. First, Experian waived any right it may have had to seek arbitration. Experian failed to raise its purported right to arbitrate for more than nine months. Instead, it chose to litigate this matter, filing numerous documents with the Court, engaging in substantial discovery, having conferences with counsel, and taking other actions showing an intent to litigate in this Court. Experian chose to defend this action in this Court the entire time. Only after a mediation session failed to resolve the case did Experian change its strategy and assert an alleged right to arbitrate. By its long delay and extensive participation in this litigation, Experian has waived any possible right to arbitration.

Separate from this waiver, Experian's Motion must be denied because the arbitration provision does not apply to Plaintiff's claims, which are based on Experian's actions in violation of the FCRA, and do not arise out of nor are they "directly related to" the agreement with ECS. As such, the Federal Arbitration Act ("FAA") does not apply to this action.

1

## FACTS

Plaintiff Becomes the Victim of Identity Theft

Plaintiff is a victim of identity theft. The thief is her former fiancé who opened 23 small loans with co-defendant Affirm, Inc. ("Affirm") using her name and identification, without her knowledge or consent. Declaration of Alana Cimillo ("Cimillo Decl.") ¶ 2. She first learned of the fraudulent Affirm loans in December 2019 when she received collection notices from the collection agency, Afni, Inc. *Id.* In January 2020, Plaintiff and her father called Afni and were shocked to learn that the former fiancé had opened many Affirm loans in her name. *Id.* The Afni agent said he could see this was identity theft. *Id.*

In December 2020, Plaintiff received alerts from her bank that her credit had negative activity. *Id.* at ¶ 3. She checked and saw that her rating had dropped substantially. *Id.* She contacted Afni, and it told her it was not collecting on the loans and she should contact Affirm. She called Affirm and informed it that the loans in her name were the result of identity theft. *Id.* Affirm advised her to provide Affirm with an identity theft affidavit. *Id.* Affirm said it would begin investigating her disputes. *Id.*

On December 23, 2020, Plaintiff went to her local police department and filed a report of the identity theft with the police. *Id.* at ¶ 4. She sent Affirm the police report and an identity theft affidavit in support of her dispute. *Id.*

Plaintiff signed up with Experian online to receive free credit reports and did so to be able to monitor her credit. She does not recall at any time having signed up for CreditWorks or ever using that service. She also does not recall ever having seen or entered into an agreement to arbitrate or otherwise relinquish her Seventh Amendment right to a jury trial. *Id.* at ¶ 5.

2

<u>Plaintiff Sends Disputes to Experian</u>

Plaintiff began a series of disputes to Experian in 2021. She mailed a dispute letter to Experian about the Affirm accounts on February 10, 2021. *Id.* at ¶ 6. She disputed eighteen Affirm accounts and explained that they were the result of identity theft. *Id.* She enclosed both an identity theft affidavit she had filed with the Federal Trade Commission in February 2021 and the police report she had filed in December 2020. *Id.* She also included copies of her driver's license, a recent utility bill, and a letter from Synchrony Bank acknowledging that there had been fraudulent use of her account. *Id.*

Experian did not delete or block its reporting of any of the disputed accounts. Instead, it sent dispute results dated March 18, 2021, in which it stated that it had verified the accuracy of seventeen of the accounts Plaintiff had disputed. *Id.* at ¶ 7. Experian did not explain why it had not responded to one of the eighteen disputes. *Id.* Experian also provided a report showing it was still reporting all the Affirm accounts. *Id.*

Plaintiff's receipt of these results and the report from Experian caused Plaintiff to mail another dispute letter to Experian on April 8, 2021, to try again get the accounts off her report. *Id.* at ¶ 8. She stated that she was writing in response to the results Experian had sent to her. *Id.* She again disputed eighteen Affirm accounts and again explained about the identity theft. *Id.* She provided a statement that she asked be included in her credit file, and she requested a description of Experian's reinvestigation procedures. *Id.* In response, Experian sent dispute results dated May 10, 2021. *Id.* at ¶ 9. Experian again stated it had determined the disputed accounts were accurate and provided her credit report showing it was still reporting all the Affirm accounts. *Id.*

This response was not satisfactory to her, and she mailed another dispute letter to Experian on June 16, 2021, regarding the Affirm accounts. *Id.* at ¶ 10. Experian sent a response

3

dated June 29, 2021, saying that in order to block the information she had disputed she needed to send an identity theft report and identification information, which she had already sent. *Id.* at ¶ 11. Experian sent dispute results dated July 14, 2021, indicating that it had verified the Affirm accounts were accurate, and enclosing a report showing those accounts remained in her file. *Id.*

In response to receiving those results, Plaintiff mailed another dispute letter to Experian about the Affirm accounts, on August 5, 2021. *Id.* at ¶ 12. She enclosed an updated FTC Identity Theft Report. *Id.* Experian sent a response dated August 14, 2021, stating that it had reinvestigated all her disputes, and which showed that all the disputed accounts remained on her report. *Id.* at ¶ 13. Experian also sent Plaintiff a letter dated August 14, 2021, saying it would not reinvestigate her disputes. *Id.* The Affirm accounts continued to be reported by Experian. *Id.* Plaintiff filed this lawsuit in response. *Id.* at ¶ 14. Experian continued reporting the Affirm accounts into July 2022, and still is doing so, as far as Plaintiff knows. *Id.*

Experian repeatedly furnished credit reports about Plaintiff containing the false Affirm accounts to various third parties in 2021, including to Bank of America, DARCARS Lexus, Toyota Motor Credit Corp., Tarrytown Honda, Honda Financial Services, and Capital One Auto Finance, Inc. in response to credit inquiries triggered when Plaintiff sought credit. *Id.* at ¶ 15. These Experian reports caused Plaintiff to be denied credit and suffer other adverse credit actions. *Id.*

Experian Participates Extensively in the Litigation for More Than Nine Months

This action was filed on November 4, 2021. Dkt. 1. Experian asserts that the purported agreement to arbitrate was entered into when Plaintiff signed up for CreditWorks on July 28, 2019. Declaration of David Williams In Support of Experian's Motion to Compel Arbitration ("Williams Decl.") at 2-4. Thus, Experian had access to that agreement when the case was filed.

Experian chose not to file a motion to compel arbitration at that time. Rather, Experian has participated extensively in this litigation to date.

Experian's attorney made an entry of appearance. Dkt. 13. Experian filed its corporate disclosure statement and a letter motion for an extension of time to respond to the Complaint. Dkts. 14, 15. Experian filed its Answer on December 30, 2021. Dkt. 17. Experian's Answer did not assert, or even mention, arbitration, whether as an affirmative defense or otherwise. *Id.*

On January 11, 2022, Experian participated in a Rule 26(f) conference with Plaintiff and Affirm. Declaration of Adam G. Singer ("Singer Decl.") at ¶ 9. The discussion about the case management plan included, among other things, a fact discovery deadline of June 7, 2022, and an expert discovery deadline of August 7, 2022. The parties also conferred about their present best estimate of the length of a trial. The plan template set forth that the parties were to submit a Joint Pretrial Order on September 6, 2022, within 30 days after the completion of all discovery (absent the filing of a dispositive motion). *Id.* Experian also received Plaintiff's notice of the initial pre-trial conference that same day via email. *Id.* at ¶ 11.

Also on January 11, Experian and Plaintiff separately discussed a proposal for Experian to produce certain documents informally in order to limit attorney's fees in this fee-shifting matter. *Id.* at ¶ 10. Plaintiff's counsel also raised the contention that a number of Experian's affirmative defenses were impermissible under the Federal Rules of Civil Procedure and asked whether Experian either would revise those defenses or would consent to an extension of Plaintiff's time to move to strike them pursuant to Rule 12(f), again in an effort to limit attorney's fees. *Id.* Plaintiff and Experian exchanged multiple emails about these topics from January 11 through January 18, 2022. *Id. At no time throughout the entirety of these discussions about Experian's affirmative defenses did Experian's counsel raise the issue of arbitration. Id.*

On January 19, 2022, Experian entered into a stipulation of an extension of time for Plaintiff to file a motion to strike Experian's affirmative defenses. Dkt. 22. The Court granted the extension. Dkt. 23.

Also on January 19, 2022, a proposed case management plan was filed with Experian's consent. Dkt. 24. The case management plan set forth the parties' proposed litigation schedule and estimated trial length consistent with the parties' January 11, 2022 conference pursuant to Rule 26(f). Singer Decl. at ¶ 13.

On January 21, 2022, a proposed protective order was entered, signed by counsel for all parties. Dkt. 27. On February 7, 2022, Experian participated in the initial pre-trial conference before this Court. Dkt. Minute Entry. *At no time during this conference was arbitration ever mentioned by Experian.* Singer Decl. at ¶ 15.

The parties engaged in substantial discovery. Experian served its initial disclosures. *Id.* at ¶ 19. Plaintiff served her initial disclosures to Experian. *Id.* Plaintiff served requests for production and interrogatories on both Affirm and Experian. *Id.* Experian served Plaintiff with thirty-five requests for production and eight interrogatories. *Id.*

Experian served responses to Plaintiff's interrogatories and requests for production. *Id.* at ¶ 20. Experian also served amended responses Plaintiff's requests for production. *Id.* Experian produced documents on February 14, April 5, and April 28, 2022. *Id.* After Experian made its first production on February 14, counsel for Plaintiff contacted then-counsel for Experian on February 23 to arrange a time to meet and confer about Experian's document production. They then met and conferred on March 14, when they held al lengthy discussion of issues related to Experian's production for one hour and nineteen minutes. *Id.*

Plaintiff expended considerable time and resources in preparing responses to Experian's thirty-five requests for production and its eight interrogatories. *Id.* at ¶ 21. Plaintiff produced 169 documents to Experian. *Id.*

Experian also obtained more than 3000 documents produced by Affirm. *Id.* at ¶ 22. Most of these directly pertain to the Affirm accounts at issue. *Id.*

In addition, Experian was provided with documents that Plaintiff obtained through subpoenas on Afni and Synchrony Bank, relating to the Affirm accounts and a separate identity theft by the same thief. *Id.* at ¶ 23.

Experian also received Plaintiff's responses to Affirm's discovery requests to Plaintiff, which included forty-one responses to requests for production, twenty-five responses to interrogatories, and eighty-eight responses to requests for admission. *Id.* at ¶ 24. These responses provided Experian with key information about the Affirm accounts and Plaintiff's damages. *Id.*

On March 9, 2022, Plaintiff filed for leave to file an Amended and Supplemental Complaint, to which Experian consented. Dkt. 30. Plaintiff then filed an Amended and Supplemental Complaint. Dkt. 33. Experian filed its Answer on April 6, 2022. Dkt. 34. Once again, Experian failed to mention arbitration in its Answer. Dkt. 34.

On May 17, 2022, Experian signed a joint letter motion requesting a stay for the purpose of participating in mediation. Dkt. 36. The Court granted the stay. Dkt. 37. Experian and Plaintiff participated in mediation on August 3, 2022. Singer Decl. at ¶ 30. The mediation did not achieve a settlement. *Id.* Experian then decided it would move to compel arbitration, filing its motion on August 15, 2022. Dkt. 45. In sum, Plaintiff's counsel and Experian's counsel have had an extensive series of communications related to this litigation, including telephone calls, letters, and emails, which required an enormous amount of time. Singer Decl. at ¶ 31.

<u>Plaintiff's Claims</u>

Plaintiff's claims arise from and are based solely on actions of Experian that did not comply with the statutory requirements of the FCRA and similar requirements in the NY FCRA. Her claims arise solely under these statutes as a result of Experian's violations thereof, not under any contract.

**ARGUMENT**

**I.    <u>Experian Has Waived Any Right to Seek Arbitration</u>**

Experian's motion must be denied because it has waived any possible right to seek arbitration through its lengthy and voluntary participation in this litigation, despite knowing of the purported arbitration agreement since the case was filed and waiting more than nine months before any assertion of any alleged contract to arbitrate.

**A.    The Issue of Litigation Waiver Is for the Court**

It is well settled within the Second Circuit that the issue of whether a party has waived an alleged right to arbitrate through litigation conduct is an issue for the court, and not the arbitrator to decide. *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 80-81 (2d Cir. 2017) ("When the party seeking arbitration has participated in litigation regarding the dispute, the district court can properly decide the question of waiver.") (citing *Bell v. Cendant Corp.*, 293 F.3d 563, 569 (2d Cir. 2002); *Apple & Eve, LLC v. Yantai N. Andre Juice Co.*, 610 F. Supp. 2d 226, 230 (E.D.N.Y. 2009) (litigation conduct waiver must be decided by court, not arbitrator); *Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d 597, 612-15 (S.D.N.Y. 2020).

**B.    Experian Waived Any Right to Arbitrate Through Its Long Delay in Seeking Arbitration and the Amount of Litigation Conducted**

In the Second Circuit, it was until recently settled law that in determining whether a party has waived arbitration, the court would consider three factors: (1) the time elapsed from the

commencement of litigation until the request for arbitration, (2) the amount of litigation conducted, including motion practice and discovery, and (3) proof of prejudice to the opposing party. *Louisiana Stadium & Exposition Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d. Cir. 2010). "There is no rigid formula or bright-line rule for identifying when a party has waived its right to arbitration; rather, the above factors must be applied to the specific context of each particular case." *Id.*

The Supreme Court, however, recently held that prejudice was not properly a factor, and that waiver of the ability to seek arbitration should be determined by the same standard as with any other contractual right. *Morgan v. Sundance, Inc.,* 142 S. Ct. 1708, 1712-14 (2022). Without the prejudice factor, the other two factors, time elapsed and litigation conducted, are the same as the Second Circuit's preexisting test for forfeiture outside the arbitration context. *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) (citing, inter alia, *PPG Industries, Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 108 (2d Cir. 1997) (delay in demanding arbitration) (prior parenthetical in original)); *see also Morgan*, 142 S. Ct. at 1714 ("If an ordinary procedural rule—whether of waiver or forfeiture or what-have-you—would counsel against enforcement of an arbitration contract, then so be it"). Thus, this Court should consider only the first two factors, time elapsed and the amount of litigation conducted, in determining waiver or forfeiture.

1. Experian Delayed for More Than Nine Months

Experian relies on an arbitration provision in an agreement it claims that Plaintiff made in July 2019. ("Williams Decl.") at 2-4. This action was commenced on November 4, 2021. Thus, Experian was aware of the arbitration provision it relies on since this action was commenced. Yet, it waited more than nine months, and did not file the Motion until August 15, 2022.

Such a delay is a strong factor in favor of finding waiver. See *Louisiana Stadium*, 626 F.3d at 158 (eleven-month delay supports finding of waiver); *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) *Hamilton v. Atlas Turner, Inc.*, 197 F.3d 58, 61 (2d Cir. 1999) (waiver found where seven-month delay in seeking arbitration); *PPG Industries, Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 108 (2d Cir. 1997) (waiver found based on five-month delay).

That delay is even more indicative of waiver when compared to Experian's actions in other litigation, where it regularly moves to compel arbitration at the outset of a case, even where there is no indication from the face of a complaint that any credit monitoring product is implicated by the claims. *See, e.g., Meeks v. Experian Info. Sols., Inc.*, No. 21-cv-03266-VC, 2021 WL 3878734 (N.D. Cal. Aug. 31, 2021) (denying motion to compel arbitration filed less than 60 days after complaint, and before answer filed); *Lok v. Experian Info. Sols., Inc.*, No. 7:21-cv-00154 (S.D.N.Y.) at ECF 1, 8 (letter motion to compel arbitration filed 29 days after filing of complaint and before answer filed); *Sauer v. Experian Info. Sols., Inc.*, No. 8:21-cv-00963 (C.D. Cal.) at ECF 1, 17 (filing of motion to compel arbitration 42 days after complaint and before answer filed); *Matthews v. Experian Info. Sols., Inc.*, No. 2:21-cv-01089 (E.D. Pa.) at ECF 1, 8 (filing of motion to compel arbitration 56 days after complaint and before answer filed); *Clark v. Experian Info. Sols., Inc.*, No. 8:20-cv-02122 (C.D. Cal.) at ECF 1, 20 (filing of motion to compel arbitration 57 days after complaint and before answer filed). In addition to these cases, Experian has cited four other cases in which it filed motions to compel arbitration against consumers bringing FCRA cases. See Mem. in Support of Motion at 1.

Clearly, Experian was aware of its ability to seek arbitration in Plaintiff's case from the outset, as it had done in many similar cases. *But it failed to do so here.* That is proof of waiver.

## 2. Experian Has Participated in Substantial Litigation

Experian had multiple opportunities to seek arbitration. Rather than do so, Experian has litigated the action vigorously in this forum and failed to raise arbitration in any answer or pleading until its Motion was filed nine months after the litigation commenced. It filed pleadings, had conferences with the Court and counsel, and conducted and benefitted from extensive discovery under the Federal Rules of Civil Procedure. The details of Experian's extensive participation in the litigation are set forth in the Facts section. All these actions were directly contrary to seeking a change in the forum. They are additional evidence of waiver.

The Second Circuit has cited such conduct in finding waiver of the ability to seek arbitration. In *PPG Industries*, the Second Circuit found waiver by "engaging in discovery," "filing substantive motions" in a related action for "approximately five months" before moving to compel arbitration, and not asserting arbitration in its answer, which "evidenced a preference for litigation that supports a finding of waiver." 128 F.3d at 108–09. In *Leadertex, Inc*., the Second Circuit found that a party waived its right to arbitration by submitting and amending several pleadings, failing to assert an arbitration defense in its answer, engaging in an "energetic pursuit of discovery," and waiting seven months before seeking arbitration. 67 F.3d at 26.

Courts have found waiver even where no discovery took place at all. *See, e.g., Louisiana Stadium*, 626 F.3d at 159 (upholding finding of litigation waiver prior to discovery). In *Louisiana Stadium*, the Second Circuit held that a party waived its right to arbitrate by waiting eleven months to seek arbitration while defendants filed procedural motions, submitted a lengthy letter detailing perceived deficiencies in the complaint, and began work on a motion for judgment on the pleadings, even though discovery had not yet begun. 626 F.3d at 159–60.

In this case, Experian has engaged in the same actions as the Second Circuit has held constitute waiver. Under the Second Circuit precedents, and the facts in this record, Experian waived any right it may have had to seek arbitration by its unreasonable delay in moving to compel arbitration and its active and extensive participation in litigation before this Court.

Experian repeatedly failed to seek, or even mention, arbitration, despite numerous opportunities to do so. It could have sought arbitration rather than seeking more time to file an Answer to the complaint, or instead of filing an Answer to the Complaint. But Experian filed an Answer, without ever mentioning any arbitration agreement. On April 6, 2022, Experian again chose not to seek arbitration but instead filed an Answer to Plaintiff's Amended and Supplemental Complaint with no hint about arbitration. The Second Circuit has frequently cited the failure to assert arbitration in an answer as an important factor in finding waiver. *See PPG Industries*, 128 F.3d at 109 (evidence of intent to litigate by failing to assert defense of arbitration in answer); *Leadertex*, 67 F.3d at 26 (waiver found where neither answer, amended answer, or answer to amended complaint asserted arbitration)); *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991) (raising affirmative defenses and counterclaims without asserting right to compel arbitration a significant factor in waiver). *See also Coronel v. Bank of America, N.A.*, Case No. 19-8492 (ES) (MAH), 2022 U.S. Dist. LEXIS 147116, at *12 (D.N.J. August 17, 2022) (finding waiver by Experian where no arbitration defense included in Experian's answer or amended answer; "[C]ourts have not hesitated to hold that the right to arbitrate has been waived . . . where the defendant had 'invoked the litigation machinery' by, *inter alia*, filing an answer without asserting arbitration as an affirmative defense . . . ." quoting *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 926 (3d Cir. 1992).

Experian could have raised its arbitration defense at the initial pretrial and case management conference held with this Court on February 7, 2022. Instead, Experian joined in the parties' estimate that a trial would require four to five days. *See* Dkt. 29 and preceding Minute Entry. Experian was clearly communicating to Plaintiff and to this Court that it intended to litigate in this Court and was planning for a trial before this Court, not a hearing before an arbitral tribunal.

Experian also engaged in settlement discussions, participating in a mediation session with Plaintiff on August 3, 2022. *See* Dkt. 43. Only after the case failed to settle at mediation did Experian decide it wanted a different forum.

Yet, for nine months prior to invoking that strategy, Experian utilized the resources of this Court, and the other parties, in litigation before this Court. But now all the pleadings and conferences in this Court, and all the actions by this Court will be negated, and all that time and effort wasted, because Experian wants to move the case to a different forum with different rules and a different fact-finder.

Just last month, a court found Experian waived its right to arbitrate under circumstances remarkably similar to the instant case after six months of delay:

> Experian says its conduct amounts to "routine procedural actions" that cannot trigger a waiver. (Doc. 50 at 4.) The Court disagrees.
>
> For nearly six months, Experian invoked the juridical process and litigated this case with no indication it was contemplating arbitration. Experian filed two answers, exchanged written discovery, and attended mediation. And when mediation failed, Experian participated in a case management conference and submitted a case management report asking for a jury trial—all without mentioning arbitration. From all appearances, then, Experian intended to have Soriano's claims adjudicated in court. These actions, viewed in combination, constitute conduct wholly inconsistent with the right to arbitration . . . Mims v. Glob. Credit & Collection Corp., 803 F. Supp. 2d 1349, 1354 (S.D. Fla. 2011) (finding waiver when the defendant attended hearings, participated in mediation, and failed to invoke the right to arbitration for several months).

Not going down without a fight, Experian claims this Court has declined to find waiver on similar facts . . . But in Bennett, unlike here, the defendant pled arbitration as an affirmative defense. That distinction makes all the difference. "The key ingredient in the waiver analysis is fair notice to the opposing party and the District Court of a party's arbitration rights and its intent to exercise them." Gutierrez v. Wells Fargo Bank, NA, 889 F.3d 1230, 1236 (11th Cir. 2018). "Accordingly, fair notice at a relatively early stage of litigation is a primary factor in considering whether a party has acted consistently with its arbitration rights." Id. There was no fair notice here—Experian waited nearly half-a-year before saying anything about arbitration.

While a defendant need not raise arbitration in response to the complaint to avoid waiver, it cannot say nothing and drag the plaintiff (and the Court) through months of needless litigation as here. "The judicial system was not designed to accommodate a defendant who elects to forego arbitration when it believes that the outcome in litigation will be favorable . . . and then suddenly change[] course and pursue[] arbitration." Id. The waiver doctrine exists to prevent parties from invoking the judicial process and thereby defeating the key purpose of arbitration: "saving the parties' time and money." Id.

*Soriano v. Experian Info. Sols., Inc*., 2022 U.S. Dist. LEXIS 185783 at *7-9 (M.D. Fla.

Oct. 11, 2022).

## II.    The Arbitration Provision Does Not Apply to Plaintiff's FCRA Claims

Even if the Court decides that Experian did not waive its right to move to compel

arbitration and considers Experian's motion, the Court should deny Experian's Motion because

Plaintiff's claims are not covered by the arbitration provision. As the Supreme Court has stated:

"a court may order arbitration of a particular dispute only where the court is satisfied that the

parties agreed to arbitrate *that dispute." Granite Rock Co. v. Int'l Bd. Of Teamsters,* 561 U.S.

287, 297 (2010) (emphasis in original) (citation omitted).

### A.    The Arbitration Provision Only Applies to Disputes and Claims "Directly Related to the Services or Websites"

The arbitration provision at issue here only applies to "***disputes and claims between us***

***arising out of this Agreement directly related to the Services or Websites*** to the maximum

extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration." (Williams Decl. Exhibit 3, Document 47-3, at 4.) (emphasis added).[1] By its terms, ECS has chosen to expressly limit arbitration to claims (1) arising out of the agreement between Plaintiff and ECS and (2) directly related to the services or websites provided by ECS.

Plaintiff's claims do not "arise out" of the Agreement with ECS. That agreement is for a service in which ECS provides her with information related to her credit history. The "Service" is defined as including, but not limited to:

> the provision of any of our products and services, including credit report(s), credit risk score(s), credit monitoring, identity theft protection and surveillance monitoring, credit score monitoring and credit score tracking (including all the data and information contained therein), the receipt of any alerts notifying you of changes to the information contained in your credit report(s), regardless of the manner in which you receive the Services . . . .

Plaintiff's claims do not arise out of the agreement in which ECS provides Plaintiff with credit reports or other information about her credit. In addition, Plaintiff's claims are not "directly related" to ECS' service of providing information to Plaintiff.

Plaintiff's claims arise out of the actions of a different company, the consumer reporting agency Experian, that did not comply with the requirements of the FCRA. Specifically, Experian violated FCRA § 1681e(b) by preparing and sending out credit reports to third parties without following reasonable procedures to assure the maximum possible accuracy of the information in those reports. These claims do not arise from the agreement with ECS to provide Plaintiff with information about her credit. They arise from the actions of Experian in preparing and furnishing her credit reports.  Experian's actions were independent of the Services provided by ECS.

---

[1] Although Experian frequently cites to the arbitration provision in the "current" Terms of Use Agreement dated July 28, 2022 (Exhibit 4 to the Motion), that provision expressly excludes "pending" disputes such as this one, as discussed below. Therefore, Plaintiff focuses her arguments on the original Agreement.

Likewise, the claims are not "directly related" to the service provided by ECS. The service by ECS did not cause or have anything to do with Experian furnishing an inaccurate report on Plaintiff. They are not "related" at all, much less "directly."

It is only because Experian furnished her inaccurate reports to third parties that Plaintiff is able to bring a claim under § 1681e(b). Nothing in the agreement with ECS required, directed, or permitted Experian to issue an inaccurate credit report to a third party. That subject was not even addressed. Experian furnished those reports because its business as a consumer reporting agency is to furnish credit reports to its customers. Experian would have issued those reports regardless of whether Plaintiff had an agreement with ECS, or the terms of such an agreement.

Experian argues that Plaintiff learned of the fraudulent accounts through ECS and this means that her claims arise under the agreement with ECS. But even if that were so, it does not bring her FCRA claims within the arbitration provision. Her claims are not based on her *knowledge* of the inaccurate information. They are based on Experian's preparing and sending inaccurate credit reports to third parties. Without those actions by Experian, she has no claim, even if she knew about the inaccurate information.

The Supreme Court recently held that only consumers who had inaccurate information on reports that were *sent to third parties* had standing to bring claims under § 1681e(b). *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Consumers who could not prove that their inaccurate reports were sent to a third party lacked standing to bring an § 1681e(b) claim. *Id.* at 2210.

It is also well-established in the Second Circuit that a consumer cannot make a claim for pain, suffering, or emotional distress under the FCRA merely because a consumer reporting agency has a report with inaccurate information on it. *Casella v. Equifax Credit Information*

*Services*, 56 F. 3d, 469 (2d Cir. 1995). The consumer must show that the inaccurate report was provided to a third party. *Id*. at 475.

Here, the § 1681e(b) claim arises solely from Experian's actions in preparing an inaccurate credit report and sending it to a third party. It does not "arise" from the agreement with ECS and is not "directly related" to the service provided by ECS.

The same is true for Plaintiff's claims under § 1681i. The § 1681i claim is based on Experian's failure to perform a reasonable reinvestigation (and take other required actions) regarding information that Plaintiff disputed to Experian as fraudulent. The claim only exists because of actions by Experian that did not comply with the FCRA. If Experian had performed a reasonable reinvestigation and met all its FCRA duties, Plaintiff could not bring her claim. The claims do not arise from the ECS agreement and are not "directly related" to the services of ECS.

Experian was *required* by the FCRA to conduct a reinvestigation, and would have done so, albeit unreasonably, even if Plaintiff did not have an agreement with ECS. The fact that Experian did not conduct a reasonable reinvestigation is a result of its procedures for conducting such reinvestigations. Those procedures are not related to the agreement Plaintiff had with ECS.

Experian may argue the Plaintiff learned from ECS about the inaccurate information that she disputed and claim that means that her claims arose out of the agreement with ECS. But that would not matter, even assuming it were true. Even if Plaintiff did learn of the inaccurate information from ECS, that *knowledge* is not the basis of her claims. The claims exist only because *Experian failed to act in compliance with the FCRA*. Her claims are based on Experian's action, not her knowledge.

Moreover, as a factual matter, Plaintiff's repeated disputes were made because of Experian's response to her disputes, not ECS' information. Each time that Plaintiff disputed,

Experian would respond by sending results of its reinvestigations saying that the Affirm accounts had been verified as accurate and provide a report showing those accounts were still on her report. These results and reports would cause Plaintiff to dispute to Experian again, which she did throughout 2021, trying to get those accounts off of her credit report. Cimillo Decl. at 8-12.[2]

Both *Ramirez* and *Casella* establish that mere knowledge of inaccurate information is not sufficient for an FCRA claim. As the Second Circuit noted:

> "Casella's argument boils down to the bare contention that he is entitled to damages for pain and suffering simply because he knew of an inaccurate and potentially damaging item in his credit report. We are unaware of any case extending FCRA damages that far, and we decline to reach that result here." 56 F. 3d at 475 (emphasis in original) (citations omitted).

For the same reason, Plaintiff's claims are not "directly related" to the services of ECS. Those claims are not based on any knowledge she obtained, but rather on the non-compliant actions of Experian.

Plaintiff's other FCRA claim is that Experian failed to block the fraudulent information, as required by § 1681c-2, when Plaintiff sent a dispute to Experian that included an identity theft report. Again, it is solely Experian's failure to block the information that provides the basis for Plaintiff's claim. Experian would either block it or not block it according to its procedures, regardless of whether Plaintiff had an agreement with ECS, and unrelated to services of ECS.

Experian also argues that it provided information to ECS that ECS then provided to Plaintiff, so Experian was involved in the services of ECS. Motion at 21. But that does not make the arbitration provision applicable to Plaintiff's claims. As discussed above, the FCRA claims do not arise from, nor are they directly related to, the service of ECS, even if Experian was

---

[2] For example, her April 2021 dispute letter states: "My name is Alana Cimillo and I am writing in response to the results you sent me." Exh. D. Her June 2021 dispute letter states: "I am writing again to dispute several accounts that Experian has included on my credit report.  The dispute results sent to me on May 10, 2021, are not satisfactory."  Ex. F.

involved in the service. The information received from ECS did not and could not give Plaintiff a cause of action against Experian under the FCRA. Thus, those claims are not and cannot be "directly related" to the service provided.

Here, Plaintiff obtained a credit monitoring service from ECS, a different company than Experian, that provides such a service directly to consumers. ECS simply obtains information from consumer reporting agencies and then sells it to consumers. Many companies provide the same type of credit monitoring services. To the extent that Experian was "involved" with ECS' service, it was just as a provider of credit information—which is its primary business—and is the same involvement it would have with any credit monitoring company.

B.    The Arbitration Provision Should Be Interpreted Narrowly

Experian may argue that the arbitration provision should be interpreted broadly, noting certain language in the arbitration provision. But that language again limits arbitration to disputes "directly relating" to the service provided by ECS. It states: "This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us ***directly relating to the provision of any Service and/or your use of any Website*** subject to arbitration to the fullest extent permitted by law." Williams Decl. Ex. 3, Dkt 47-3, at 4. (emphasis added). In regard to the scope of disputes subject to arbitration, ECS uses the phrases "directly relating" and "directly related" twice, emphasizing its importance. That express limitation must be given effect. Here, even the broadest interpretation of the arbitration clause cannot include claims that are not "directly related" to the services of ECS and which do not "arise from" the agreement.[3]

---

[3] *Christus Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 536 (Tex. 2016) ("[T]he plain and common meaning of the phrase 'directly related to' is 'an uninterrupted, close relationship or link between the things being considered.'); *Brightpoint, Inc. v. Zurich Am. Ins. Co.*,  No. 1:04-CV-2085-SEB-JPG, 2006 U.S. Dist. LEXIS 26018, at *20 (S.D. Ind. Mar. 10, 2006) ("Brightpoint's expansive interpretation of the term 'directly related' represents a distortion of

In *Cheng v. HSBC Bank USA, N.A.,* 467 F. Supp. 3d 46, 50 (E.D.N.Y. June 15, 2020), the arbitration provision at issue in that consumer case stated as follows:

> If either of us has **any dispute or disagreement with the other regarding this Service** that we cannot resolve amicably, both parties agree that the sole and exclusive remedy shall be binding arbitration in accordance with the then-current rules and procedures of the American Arbitration Association.

(emphasis added). The Court there went on to explain how it must determine whether the scope of an arbitration provision is broad or narrow. *Id* at 51. (""Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview.") (quoting *Rochdale Vill., Inc. v. Pub. Serv. Emp. Union*, 605 F.2d 1290, 1295 (2d Cir. 1979)). Critically, the Court in *Cheng* concluded that the arbitration provision is narrow *despite* its inclusion of language which, by itself may indicate a broad provision:

> In this case, the arbitration clause at issue is narrow. **Although the clause uses the broad prefatory phraseology of "any dispute or disagreement," that language is immediately qualified by "regarding this Service."** "Service," in turn, is defined in the Service Agreement as "an Electronic Balance Transfer Service . . . using CashEdge Inc." Because this arbitration clause, present only in the Service Agreement, applies exclusively to disputes regarding the service described in the Service Agreement, [**9] it was clearly not meant to "cover all disputes that might arise between the parties."

*Id.* (emphasis added). Plaintiff's FCRA allegations do not implicate the Services in the ECS language at issue in the instant case. *Id.* at 52 ("Here, a fair reading of the complaint evidences that the allegations do not bring the dispute within the terms of the Service Agreement."). Even if, however, this Court were to conclude that the provision at issue was broad, compelling arbitration still would not be appropriate because Plaintiff's FCRA claims do not implicate the

---

the policy terms. [In] *Black's Law Dictionary*, 'directly' is defined as: 'In a straight line or course' and 'immediately.'")

alleged contract at issue.  The *Cheng* Court explained that even if a clause is deemed broad and enjoys "a presumption of arbitrability," still, it is only proper to order "arbitration of a collateral matter . . . if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'").  *Id.* at 50-51 (internal citation omitted) (quoting *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 23 (2d Cir. 1995)).

Other courts including in the Southern District of New York also have concluded that similar provisions should be interpreted narrowly on similar reasoning:

> **Despite the breadth of that language when considered in isolation, however, one cannot ignore the language that follows** in this particular document. The clause in this case in relevant part in fact is limited to "any claim, dispute or controversy . . . **that in any way arises from or relates to" "the goods and/or services** you have purchased or are purchasing from us . . . including the . . . negotiation or discussion regarding purchase, discount, price or credit terms . . . ." Thus, the arbitration clause, as the magistrate judge concluded, is narrow.

*Borecki v. Raymours Furniture Co.,* No. 17-cv-1188 (LAK), 2017 U.S. Dist. LEXIS 196048 at *5 (S.D.N.Y. November 28, 2017) (emphases added) (applying the contractual interpretation principle of *ejusdem generis* which "holds that 'general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.'").  The Court there also applied the principle of "contra proferentem, i.e., ambiguous contract language is construed strongly against the drafter, in the circumstances of this case" to interpret any ambiguity in favor of "an ordinary consumer" for a contract drafted by a large company. *Id.*

Of course, Plaintiff's claims here involve independent intentional tort-like statutory violations by Experian, a key point that separates her case from many others analyzing the connection between the subject matter of the contract at issue and the claims alleged. *McMahon v. RMS Electronics, Inc.*, 618 F. Supp. 189, 191 (S.D.N.Y. 1985) (distinguishing tort claims

which are "a reformulation of []breach of contract claim[s]").  The Court in *McMahan* stated that "[i]n this Circuit, agreements to arbitrate disputes arising from a contract do not extend to tort claims that, although factually related, are considered legally distinct from the contractual relationship between the parties." *Id.* The tortious nature of Experian's conduct – necessarily involving independent intervening conduct – further supports that her claims are not "directly related to" the ECS Services and Website.  That reasoning includes defamation claims which form the common law basis for the FCRA claims at issue here. *Id.* (citing *Fuller v. Guthrie* 565 F.2d 259, 261 (2d Cir. 1977) (addressing a slander claim, "[t]he court found that the arbitration clause was intended to cover disputes relating to the performance of the contract but could not be interpreted to extend to 'wholly unexpected tortious behavior.'"); *see also, Spokeo, Inc. v. Robins*, 578 U.S. 330, 342 2016 (discussing the long history of tort victims being able to recovery for slander).

### III.  **The FAA Does Not Apply and the Court Cannot Compel Arbitration under It**

#### A.    **The Court Determines if the FAA Applies to Plaintiff's Claims**

Experian relies on the Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA") in support of its Motion. Sections 3 and 4 of the FAA empower a federal court to order a "controversy" be sent to arbitration in certain circumstances. But that power only applies if the controversy is covered by, and not excluded from, §§ 1 and 2. *See New Prime, Inc. v. Oliveira*, 139 S. Ct. 532, 202 L.Ed.2d 536 (2019). "[Sections] one and two define the field in which Congress was legislating, and §§ 3 and 4 apply only to contracts covered by those provisions." 139 S. Ct. at 538 (quotation marks and citations omitted).

In *New Prime*, the primary issue was whether the dispute involved a "contract of employment" that was excluded from the FAA under § 1. In addressing that issue, the Court recognized that arbitration could only be compelled under §§ 3 and 4 if the dispute and contract providing for arbitration were within the provisions of §§ 1 and 2. It stated that the "antecedent statutory provisions limit the scope of the Court's powers under §§ 3 and 4." 139 S. Ct. at 537.

The Court held that a court must decide whether §§ 1 and 2 cover the contract or dispute:

> "After all, to invoke its statutory powers under §§ 3 and 4 to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the boundaries of §§ 1 and 2. The parties' private agreement may be crystal clear and require arbitration of every question under the sun, but that does not necessarily mean the Act authorizes a court to stay litigation and send the parties to an arbitral forum."

*Id.* at 537–38. The Supreme Court rejected the argument that Experian makes here: that the arbitrator should decide if the FAA is applicable and Plaintiff's dispute should be resolved through arbitration, because there is a "delegation clause." The Court held that question is for the court to decide:

> "The company [New Prime] argues that an arbitrator should resolve any dispute over § 1's application because of the "delegation clause" in the parties' contract and what is sometimes called the "severability principle."
> ***
> But all this overlooks the necessarily antecedent statutory inquiry we've just discussed. A delegation clause is merely a specialized type of arbitration agreement, and the Act "operates on this additional arbitration agreement just as it does on any other." 139 S. Ct. at 538.

The Court then stated that it could use §§ 3 and 4 of the FAA to enforce a delegation clause only if that clause appeared in a contract that was encompassed by, and not excluded from, the FAA §§ 1 and 2. *Id.*

That holding applies here. This Court decides if Plaintiff's claims come within the provisions of the FAA such that it can order the case be sent to arbitration.

23

**B. Because the FAA Does Not Apply, the Court Cannot Compel Arbitration.**

Under the FAA and *New Prime*, this Court can only compel arbitration if Plaintiff's dispute is within the provisions of § 1 and § 2. Section 2 of the FAA is limited to a "written provision in a maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration ***a controversy thereafter arising out of such contract or transaction***..." (emphasis added). As discussed in Section II above, Plaintiff's claims do not arise out of the contract with ECS. They arise from the actions of Experian that did not comply with the FCRA. Accordingly, the Court does not have authority under the FAA to compel arbitration. Because the FAA does not apply, the FAA derived policy does not apply either.

IV.    <u>The Arbitration Provision in the July 28, 2022 Agreement Does Not Apply</u>

Experian provides two terms of use agreements: one it states was in effect when Plaintiff obtained ECS services in 2019, Exhibit 3; and the other that it states is currently in effect, which is dated July 28, 2022, Exhibit 4 ("2022 agreement"). Experian repeatedly quotes from and relies on the arbitration provision in the 2022 agreement in its motion.

However, the language in the 2022 agreement clearly excludes Plaintiff's pending lawsuit from the arbitration provision in that agreement. A section entitled "Amendments" states that each time the person uses the services they signify their acceptance to the then current agreement. Exhibit 4, Doc. 47-6, at 5. The 2022 agreement then excludes "then-pending disputes" from the arbitration provision in that agreement:

> "However, no unilateral amendment will retroactively modify the parties' agreed-
> to dispute resolution provisions of this Agreement for then-pending disputes,
> unless the parties expressly agree otherwise in writing." *Id.*

This language clearly provides that the Amendments to the dispute resolution provisions (i.e. arbitration) do not apply to then-pending disputes.

Plaintiff filed this case against Experian on November 4, 2021. Thus, it was a pending dispute when the 2022 agreement took effect eight months later. The arbitration provision in the 2022 agreement does not apply, and Experian cannot seek arbitration based on it. This exact issue was addressed in *Craig v. Discover Bank*, No. 21-CV-1407 W (AGS), 2022 U.S. Dist. LEXIS 105524 (S.D. Cal. June 13, 2022) . The court denied Experian's Motion to Compel Arbitration based on a February 2022 agreement with the same exclusionary language for "then-pending" disputes, as to a lawsuit filed in August 2021. *Id.* at *7–8.

## CONCLUSION

For the aforesaid reasons, Plaintiff respectfully asks the Court to deny Experian's Motion to Compel Arbitration and Stay this Action.

*/s/ Adam G. Singer*
Adam G. Singer, Esq.
**LAW OFFICE OF ADAM G. SINGER, PLLC**
One Grand Central Place
60 East 42nd Street, Suite 4600
New York, NY 10165
212.842.2428

*/s/ Robert S. Sola*
Robert S. Sola, Esq.
**ROBERT S. SOLA, P.C.**
1500 SW First Avenue, Suite 800
Portland, OR 97201
503.295.6880

*Counsel for Plaintiff Alana Cimillo*