UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ALANA CIMILLO,                                    :
               Plaintiff,                      :
v.                                                :   **OPINION AND ORDER**
                                   :
EXPERIAN INFORMATION SOLUTIONS,    :   21 CV 9132 (VB)
INC.,                                             :
               Defendant.                    :
-------------------------------------------------------------x

Briccetti, J.:

Plaintiff Alana Cimillo brings this action against defendant Experian Information

Solutions, Inc. ("EIS"), for violations of the Fair Credit Reporting Act ("FCRA") and the New

York Fair Credit Reporting Act ("NYFCRA"), arising out of EIS's alleged inaccurate reporting

of plaintiff's credit information.

Now pending is EIS's motion to compel arbitration and stay these proceedings pursuant

to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3–4.  (Doc. #45).

For the following reasons, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

**BACKGROUND**

I.      The Parties' Agreement

On July 28, 2019, plaintiff enrolled in CreditWorks, "a free online credit monitoring

product that is provided by EIS's affiliate, ConsumerInfo.com, Inc. (which does business as

Experian Consumer Services ('ECS')."  (Doc. #46 ("Def. Mem.") at 1; Doc. #47-2 ("Williams

Decl.") ¶ 3).  To join CreditWorks, plaintiff had to complete two webforms.  (Williams Decl. ¶

3).

The first webform required plaintiff to input her name, address, phone number, and email

address, select whether she had lived at her current address for at least six months, choose the

1

reason she "visited Experian" from a dropdown menu, and click a "Submit and Continue" button.  (Doc. #47-1; Williams Decl. ¶ 3).

After completing the first webform, plaintiff was presented with the second webform, which contains two sections for "Create Your Account" and "Your Order Summary."  (Doc. #47-2; Williams Decl. ¶ 3).  Under "Create Your Account," plaintiff had to provide her social security number, her birthdate, a username, and a password, as well as her billing information.  (Doc. #47-2).  Below the payment section, the second webform has four paragraphs of disclosures, including the following statement in bold font:  **"By clicking 'Submit Secure Order':  I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy and Ad Targeting Policy"** (the "Disclosure").  (Id.; Williams Decl. ¶ 4).  The language "Terms of Use Agreement" is a hyperlink in blue font that, if clicked, would open a window with the full text of the Terms of Use Agreement.  (Doc. #47-2; Williams Decl. ¶ 4).  A large purple button stating "Submit Secure Order" appears just below the Disclosure paragraph.  (Doc. #47-2; Williams Decl. ¶ 4).

After entering her information on the second webform, plaintiff clicked the "Submit Secure Order" button, thereby accepting and agreeing to the "Terms of Use Agreement" effective when plaintiff enrolled (the "July 2019 TOU").  (Williams Decl. ¶ 5).  Plaintiff could not have enrolled in CreditWorks without clicking the "Submit Secure Order" button.  (Id.).

The July 2019 TOU contains the following mandatory arbitration clause:

**DISPUTE RESOLUTION BY BINDING ARBITRATION**

PLEASE READ CAREFULLY, IT AFFECTS YOUR RIGHTS.

SUMMARY:

MOST CUSTOMER CONCERNS CAN BE RESOLVED QUICKLY AND TO THE CUSTOMER'S SATISFACTION BY CALLING ECS'S CUSTOMER

CARE DEPARTMENT AT 1-855-962-6943.  IN THE UNLIKELY EVENT THAT ECS'S CUSTOMER CARE DEPARTMENT IS UNABLE TO RESOLVE A COMPLAINT YOU MAY HAVE REGARDING A SERVICE OR WEBSITE TO YOUR SATISFACTION (OR IF ECS HAS NOT BEEN ABLE TO RESOLVE A DISPUTE IT HAS WITH YOU AFTER ATTEMPTING TO DO SO INFORMALLY), WE EACH AGREE TO RESOLVE THOSE DISPUTES THROUGH BINDING ARBITRATION OR SMALL CLAIMS COURT INSTEAD OF IN COURTS OF GENERAL JURISDICTION TO THE FULLEST EXTENT PERMITTED BY LAW.  ARBITRATION IS MORE INFORMAL THAN A LAWSUIT IN COURT.  ARBITRATION USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY, ALLOWS FOR MORE LIMITED DISCOVERY THAN IN COURT, AND IS SUBJECT TO VERY LIMITED REVIEW BY COURTS. ARBITRATORS CAN AWARD THE SAME DAMAGES AND RELIEF THAT A COURT CAN AWARD.  ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED.  ECS WILL PAY ALL COSTS OF ARBITRATION, NO MATTER WHO WINS, SO LONG AS YOUR CLAIM IS NOT FRIVOLOUS. HOWEVER, IN ARBITRATION, BOTH YOU AND ECS WILL BE ENTITLED TO RECOVER ATTORNEYS' FEES FROM THE OTHER PARTY TO THE SAME EXTENT AS YOU WOULD BE IN COURT.

Arbitration Agreement:

(a) ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services[1] or Websites[2] to the maximum

---

[1]    Under the July 2019 TOU:

"Service" includes, but is not limited to, the provision of any of our products and services, including credit report(s), credit risk score(s), credit monitoring, credit score monitoring and credit score tracking (including all the data and information contained therein), the receipt of any alerts notifying you of changes to the information contained in your credit report(s), regardless of the manner in which you receive the Services.

(Doc. #47-3 at ECF 2).

"ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

[2]    "Websites" are defined as "https://usa.experian.com, or any affiliated website (including, but not limited to, Experian.com., FreeCreditReport.com, FreeCreditScore.com, CreditReport.com, Creditchecktotal.com, CreditScore.com, usa.experian.com, and experian.experiandirect.com), or mobile applications (such as the Experian app), as well as any content provided or accessible in connection with the website(s) or mobile application(s)."  (Doc. #47-3 at ECF 2).

extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration.  This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law.

. . . .

For purposes of this arbitration provision, references to "ECS," "you," and "us" shall include our respective parent entities, subsidiaries, affiliates (including, without limitation, our service provider, CSID), agents, employees, predecessors in interest, successors and assigns, websites of the foregoing, as well as all authorized or unauthorized users or beneficiaries of Services and/or Websites or information under this or prior Agreements between us relating to Services and/or Websites.  . . .  You agree that, by entering into this Agreement, you and ECS are each waiving the right to a trial by jury . . . .  This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation of this arbitration provision.

. . . .

(c) . . . .  The arbitration will be governed by the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA.  . . .

All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement.

. . . .

(g) Notwithstanding any provision in this Agreement to the contrary, we agree that if ECS makes any change to this arbitration provision (other than a change to the Notice Address) during your membership in any Service, including credit monitoring, or subsequent to your purchase of any Service, you may reject any such change and require ECS to adhere to the language in this provision as written at the time of your enrollment or purchase if a dispute between us arises regarding such Service by providing Notice to ECS at the Notice Address above prior to initiating your dispute.

(Doc. #47-3, at ECF 4–5; <u>see</u> Williams Decl. ¶ 5).

Every version of the Terms of Use during plaintiff's enrollment in CreditWorks similarly

contains an "Arbitration Agreement" covering ECS's affiliates.[3]  (Williams Decl. ¶ 7).

II.        The Underlying Dispute

In December 2019—about five months after plaintiff enrolled in CreditWorks—plaintiff

allegedly learned that her former fiancé had taken out numerous small loans with Affirm, Inc.

("Affirm"),[4] in her name without her consent.  (Doc. #66 ("Cimillo Decl.") ¶ 2).   Plaintiff

alleges she first was informed of this activity when she received collection notices from Afni,

Inc., a collection agency.  (Id.).   In December 2020, plaintiff learned from her bank that her

credit score had "dropped substantially" and informed Affirm that the loans resulted from

identity theft.  (Id. ¶ 3).   Plaintiff then filed a police report regarding the identity theft.  (Id. ¶ 4;

Doc. #66-1).

Although plaintiff agrees she "signed up with Experian online to receive free credit

reports," she allegedly does not recall signing up for CreditWorks, using CreditWorks, seeing the

Arbitration Agreement, or entering into the Arbitration Agreement.  (Cimillo Decl. ¶ 5).   On

February 10, 2021, plaintiff sent her first dispute letter to EIS about the Affirm accounts, stating

they resulted from identity theft.  (Id. ¶ 6; Doc. #66-2).  Between that date and August 14, 2021,

plaintiff and EIS sent various letters to one another regarding the dispute.  (Cimillo Decl. ¶¶ 6–

13; Docs. ##66-2–66-10).  During this time, plaintiff alleges EIS furnished her credit reports

---

[3]        The parties dispute the relevancy of the 2022 Terms of Use, which EIS attaches in
support of its motion as Exhibit 4.  (Doc. #47-6).  For avoidance of doubt, the Court does not
consider the 2022 Terms of Use in deciding the motion, because doing so is unnecessary in light
of the July 2019 TOU's Arbitration Agreement.

[4]        Affirm was previously a defendant in this case, but was dismissed from the case after
plaintiff and Affirm reached a settlement.  (Doc. #55).

with the purportedly false Affirm accounts to various third parties, which caused plaintiff to be denied credit.  (Cimillo Decl. ¶¶ 7, 14–15).

III.     The Instant Action

On November 4, 2021, plaintiff commenced the instant action.  (Doc. #1).  On December 30, 2021, EIS filed its answer.  (Doc. #17).  On February 7, 2022, the parties attended an initial conference and the Court issued a Civil Case Discovery Plan and Scheduling Order.  (Doc. #29).  Thereafter, the parties served and responded to initial disclosures, requests for production, and interrogatories.  (Doc. #65 ("Singer Decl.") ¶¶ 19–21).  On March 9, 2022, plaintiff filed an amended complaint on consent (Docs. ##30, 33), which EIS answered on April 6, 2022.  (Doc. #34).

On May 17, 2022, the Court granted the parties' joint request to refer this action to mediation and to stay discovery pending the mediation.  (Docs. ##36, 37).  On August 3, 2022, the parties participated in mediation, which was unsuccessful as to EIS.  (Doc. #40; Singer Decl. ¶ 30).  On August 5, 2022, EIS informed plaintiff it intended to file a motion to compel arbitration.  (Doc. #43).  On August 15, 2022, EIS moved to compel arbitration.  (Doc. #45).  On September 7, 2022, the Court continued the stay of discovery pending further Court Order.  (Doc. #53).

**DISCUSSION**

I.     Standard of Review

"In the context of motions to compel arbitration brought under the Federal Arbitration Act ("FAA"), . . . the court applies a standard similar to that applicable for a motion for summary judgment." Bensadoun v. Jobe-Riat, 316 F.3d 171, 175 (2d Cir. 2003).[5]  Therefore, the Court

---

[5]     Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

"consider[s] all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits" and "draw[s] all reasonable inferences in favor of the non-moving party." Nicosia v. Amazon.com, Inc., 834 F.3d 220, 229 (2d Cir. 2016).

In reviewing a motion to compel arbitration, the Second Circuit requires courts to first "decide whether the parties agreed to arbitrate." Zachman v. Hudson Valley Fed. Credit Union, 49 F.4th 95, 101 (2d Cir. 2022). Further:

> Only if the court concludes an agreement to arbitrate exists does it determine (1) the scope of the agreement to arbitrate; (2) whether Congress intended any federal statutory claims asserted to be non-arbitrable; and (3) if some, but not all of the claims in the case are arbitrable, whether to stay the balance of the proceedings pending arbitration.

Id.

"The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." Hines v. Overstock.com, Inc., 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). "This burden does not require the moving party to show initially that the agreement would be enforceable, merely that one existed." Id. Once that is established, the burden shifts to the non-moving party to show there are factual disputes regarding the parties' agreement to arbitrate. See Oppenheimer & Co. v. Neidhardt, 56 F.3d 352, 358 (2d Cir. 1995). The party opposing arbitration "may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." Id. If that party raises a genuine issue of fact whether there was an agreement to arbitrate, the court must "proceed summarily to the trial thereof." 9 U.S.C. § 4.

II.     Agreement to Arbitrate

EIS contends plaintiff agreed to arbitrate the instant dispute.

The Court agrees.

7

A.      Legal Standard

"[P]arties may not delegate to the arbitrator the fundamental question of whether they

formed the agreement to arbitrate in the first place."  Doctor's Assocs., Inc. v. Alemayehu, 934

F.3d 245, 251 (2d Cir. 2019).  In determining whether the parties agreed to arbitrate, federal

courts "apply ordinary state-law principles that govern the formation of contracts."  First Options

of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995).

Under New York law,[6] to prove the existence of an enforceable agreement, the moving

party "must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent

to be bound."  Kasowitz, Benson, Torres & Friedman, LLP v. Reade, 98 A.D.3d 403, 404 (1st

Dep't 2012), aff'd, 20 N.Y.3d 1082 (2013).

Mutual assent may be expressed "by word, act, or conduct which evinces the intention of

the parties to contract."  Minelli Constr. Co. v. Volmar Constr., Inc., 82 A.D.3d 720, 721 (2d

Dep't 2011).  For example, a party is bound by contract terms when "he is on inquiry notice of

them and assents to them through conduct that a reasonable person would understand to

constitute assent."  Fisher v. Aetna Life Ins. Co., 32 F.4th 124, 136 (2d Cir. 2022).

Whether an offeree is on inquiry notice of certain contract terms "often turns on whether

the contract terms were presented to the offeree in a clear and conspicuous way."  Fisher v.

Aetna Life Ins. Co., 32 F.4th at 137.  In determining whether a contract term is presented clearly

and conspicuously, courts have considered, for example, if the contract term is printed so small

---

[6]      EIS contends, and plaintiff does not dispute, that New York law applies here.  "[W]here
the parties have agreed to the application of the forum law, their consent concludes the choice of
law inquiry."  Cargo Partner AG v. Albatrans Inc., 207 F. Supp. 2d 86, 93 (S.D.N.Y. 2002),
aff'd, 352 F.3d 41 (2d Cir. 2003).

as to be unreadable or buried in a lengthy document.  See Gildor v. U.S. Postal Serv., 179 F.

App'x 756, 759–60 (2d Cir. 2006) (summary order) (collecting cases).

"While new commerce on the Internet has exposed courts to many new situations, it has

not fundamentally changed the principles of contract."  Soliman v. Subway Franchisee Advert.

Fund Tr., Ltd., 999 F.3d 828, 839 (2d Cir. 2021).  "Courts routinely uphold clickwrap

agreements"—which "require users to click an 'I agree' box after being presented with a list of

terms and conditions of use"—"for the principal reason that the user has affirmatively assented

to the terms of agreement by clicking 'I agree.'"  Meyer v. Uber Techs., Inc., 868 F.3d 66, 75 (2d

Cir. 2017).  To determine if a plaintiff "assented to the terms of a web-based contract, courts

'look to the design and content of the relevant interface to determine if the contract terms were

presented to the offeree in a way that would put the offeree on inquiry notice of such terms.'"

Zheng v. Live Auctioneers LLC, 2021 WL 2043562, at *4 (S.D.N.Y. May 21, 2021) (quoting

Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019)).

B.     Analysis

The Court finds that the undisputed facts indicate the webpage design presented, and the

language used in the July 2019 TOU, clearly and conspicuously communicated the terms of the

Arbitration Agreement to plaintiff, and that plaintiff affirmatively indicated she agreed to them.

Accordingly, the Court finds the parties[7] entered into a valid agreement to arbitrate.

---

[7]     In support of the motion, EIS argues it may directly enforce the Arbitration Agreement
because, as an affiliate of ECS, it is a party to the July 2019 TOU. (Def. Mem. at 10–13).  The
Arbitration Agreement states: "For purposes of this arbitration provision, references to 'ECS,'
'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates . . . ." (Doc.
#47-3, at ECF 4).  The Williams Declaration states ConsumerInfo.com, Inc., also does business
as ECS. (Williams Decl. ¶ 1).  Further, the Williams Declaration states EIS "is an affiliate of"
ConsumerInfo.com, Inc. and ECS, and these companies are "wholly-owned subsidiaries of
Experian Holdings, Inc., and the parent company is Experian plc." (Id. ¶¶ 1–2).  Although
plaintiff disputes whether her claims properly fall under the Arbitration Agreement (see infra

To enroll in the CreditWorks service provided by EIS's affiliate, ECS, potential users—including plaintiff—had to complete various steps, including clicking a button indicating the user "accept[s] and agree[s] to" the July 2019 TOU.  (Williams Decl. ¶¶ 3–5).  Thus, plaintiff could not have enrolled in and used the CreditWorks service "without affirmatively agreeing to the terms and conditions on the page with the clickwrap agreement, and accordingly, no reasonable trier of fact could find that she did not assent to the arbitration."  Flores v. Chime Fin., Inc., 2022 WL 873252, at *5 (S.D.N.Y. Mar. 23, 2022) (collecting cases).

Specifically, the second webform—the page where a user agrees to the TOU—is relatively "uncluttered," and "[t]he entire screen is visible at once."  See Meyer v. Uber Techs., Inc., 868 F.3d at 78.  It has fields for a user's social security number, birthdate, username, password, and credit card information.  (Doc. #47-2).  Below these fields is the Disclosure paragraph, which states:  **"By clicking 'Submit Secure Order':  I accept and agree to your Terms of Use Agreement"** in bold font.  (Doc. #47-2; Williams Decl. ¶ 4).  The phrase "**Terms of Use Agreement**" is especially conspicuous in bold, blue font and hyperlinks directly to the July 2019 TOU (which contains the Arbitration Agreement).  (Doc. #47-2; Williams Decl. ¶ 4); see Meyer v. Uber Techs., Inc., 868 F.3d at 77–78 ("[A] reasonably prudent . . . user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information will be found.").  This is "a clear prompt directing users" to read the July

---

Part III)—which is an issue of scope—she does not dispute that EIS is a party to the Arbitration Agreement.  Accordingly, the Court need not consider whether EIS is a party to or a third-party beneficiary of the Arbitration Agreement.  However, EIS correctly notes that numerous courts considering the same or similar agreements involving EIS have found EIS is properly considered an affiliate under the same or similar Arbitration Agreements.  (See Def. Mem. at 11); see also Meeks v. Experian Info. Servs., Inc., 2022 WL 17958634, at *2 (9th Cir. Dec. 27, 2022) (finding "sufficient evidence that Experian sought to be bound by the arbitration provision" which defined ECS to include affiliates).

2019 TOU and "signaling that their acceptance of the benefit of registration would be subject to contractual terms." Meyer v. Uber Techs., Inc., 868 F. 3d at 79.

In addition, the Disclosure is located directly above a large purple "Submit Secure Order" button that users must click to enroll in CreditWorks. (Doc. #47-2; Williams Decl. ¶ 4). Thus, the Disclosure is "spatially coupled with the mechanism for manifesting assent—i.e., the register button" and "notice of the [July 2019 TOU] is provided simultaneously to enrollment, thereby connecting the contractual terms to the services for which they apply." Meyer v. Uber Techs., Inc., 868 F.3d at 78 (terms of service provided via hyperlink "does not preclude a determination of reasonable notice").

Thus, EIS has demonstrated that when plaintiff registered for CreditWorks, she agreed to the July 2019 TOU, including its Arbitration Agreement; and plaintiff has failed to rebut this.

Plaintiff admits she "signed up with Experian online to receive free credit reports and did so to be able to monitor [her] credit" (Cimillo Decl. ¶ 5), and she does not dispute that through the July 2019 TOU, she entered into an agreement to arbitrate with EIS. However, plaintiff maintains she does "not recall at any time having signed up for Creditworks nor ever using that service" and does "not recall ever having seen or entered into an agreement to arbitrate." (Id.). While it may be true that plaintiff does not remember signing up for CreditWorks, "it does not create an issue of fact as to whether she assented to the contract's terms." Flores v. Chime Fin., Inc., 2022 WL 873252, at *5. And, plaintiff's contention "that she does not recall seeing" the Arbitration Agreement "is insufficient to create a genuine issue of material fact as to whether the parties entered into" the Arbitration Agreement. Mancilla v. ABM Indus., Inc., 2020 WL 4432122, at *7 (S.D.N.Y. July 29, 2020) (collecting cases).

Accordingly, EIS has demonstrated the existence of an agreement to arbitrate.

III.     Scope of Arbitration Agreement

EIS argues the scope of the Arbitration Agreement should be determined by an arbitrator, rather than the Court, pursuant to the July 2019 TOU.

The Court agrees.

A.     Legal Standard

"[T]he question of who decides arbitrability is itself a question of contract" and parties may "agree by contract that an arbitrator, rather than a court, will resolve threshold arbitrability questions as well as underlying merits disputes." Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 527 (2019).  "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." Id. at 528.

"In determining whether the arbitrability of a dispute is to be resolved by the court or the arbitrator, the arbitration agreement is determinative." DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th 308, 318 (2d Cir. 2021).  "[C]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." Henry Schein, Inc. v. Archer & White Sales Inc., 139 S. Ct. at 531.  "Rarely, however, do arbitration agreements directly state whether the arbitrator or the court will decide the issue of arbitrability. In the absence of such clear language, courts must look to other provisions of the agreements to see what contractual intention can be discerned from them." DDK Hotels, LLC v. Williams-Sonoma, Inc., 6 F.4th at 318.

Further, "[w]here the parties explicitly incorporate procedural rules that empower an arbitrator to decide issues of arbitrability, the incorporation may serve as clear and unmistakable evidence of the parties' intent to delegate arbitrability to an arbitrator." DDK Hotels, LLC v.

Williams-Sonoma, 6 F.4th at 318.  For arbitration agreements incorporating the AAA

Commercial Arbitration Rules—which "explicitly empower an arbitrator to resolve questions of

arbitrability"—the Second Circuit has "found incorporation of these rules into an arbitration

agreement to be relevant in evaluating whether there is clear and unmistakable evidence of the

parties' intent to delegate the question of arbitrability to the arbitrator."  Id.  Nevertheless,

incorporation of such rules is not decisive  "where other aspects of the contract create ambiguity

as to the parties' intent."  Id.

Finally, if the arbitration agreement broadly "expresses the intent to arbitrate all aspects

of all disputes, this—coupled with incorporation of rules that expressly empower an arbitrator to

decide issues of arbitrability—constitutes clear and unmistakable evidence of the parties' intent

to delegate the question of arbitrability to the arbitrator."  DDK Hotels, LLC v. Williams-

Sonoma, 6 F.4th at 318–19.

B.      Analysis

As an initial matter, the Court must resolve whether the Court or an arbitrator should

determine the scope of the Arbitration Agreement.

First, the July 2019 TOU's Arbitration Agreement section explicitly delegates questions

concerning its scope to an arbitrator:

> All issues are for the arbitrator to decide, including the scope and enforceability of
> this arbitration provision as well as the Agreement's other terms and conditions,
> and the arbitrator shall have exclusive authority to resolve any such dispute relating
> to the scope and enforceability of this arbitration provision or any other term of this
> Agreement.

(Doc. #47-3 at ECF 4–5) (emphasis added).  Thus, the July 2019 TOU "clearly and unmistakably

elects to have the resolution of the arbitrability of the dispute decided by the arbitrator."  Metro.

Life Ins. Co. v. Bucsek, 919 F.3d 184, 191 (2d Cir. 2019).

Second, the July 2019 TOU states any "arbitration will be governed by the Commercial

Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related

Disputes (collectively, 'AAA Rules')" of the AAA and "[i]n all events, the AAA Rules shall

govern the parties' dispute."  (Doc. #47-3 at ECF 4).  Absent other ambiguities as to the parties'

intent, such incorporation likewise is "clear and unmistakable evidence of the parties' intent to

delegate the question of arbitrability to the arbitrator."  DDK Hotels, LLC v. Williams-Sonoma,

Inc., 6 F.4th at 318; see Nortek Inc. v. ITT LLC, 2022 WL 656896, at *5 (S.D.N.Y. Mar. 4,

2022) (collecting cases finding intent to delegate based on incorporation of AAA Rules), mot. for

clarification denied, 2022 WL 2657189 (S.D.N.Y. July 8, 2022).

Accordingly, the Court concludes the July 2019 TOU evinces the parties' clear and

unmistakable intent for an arbitrator to resolve the scope of the Arbitration Agreement, including

whether plaintiff's FCRA claims must be arbitrated.[8]

IV.     Exemption from the FAA

Plaintiff argues the FAA does not apply because her FCRA claims do not arise out of the

July 2019 TOU.

The Court disagrees.

Section 2 of the FAA provides:  "A written provision in . . . a contract evidencing a

transaction involving commerce to settle by arbitration a controversy thereafter arising out of

such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

---

[8]     Plaintiff does not argue Congress precluded her FCRA claims from arbitration.
However, "[w]ith respect to the FCRA, district courts within the Second Circuit regularly
compel arbitration of such claims."  See Ostreicher v. TransUnion, LLC, 2020 WL 3414633, at
*9 (S.D.N.Y. June 22, 2020) (collecting cases).

In New Prime, Inc. v. Oliveira, the Supreme Court recognized that for a court "to invoke its statutory powers under [Sections] 3 and 4 [of the FAA] to stay litigation and compel arbitration according to a contract's terms, a court must first know whether the contract itself falls within or beyond the bounds of [Sections] 1 and 2 [of the FAA]." 139 S. Ct. 532, 537 (2019). Specifically, Oliveira concerned whether language in Section 1 of the FAA, which exempts "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" from the FAA, meant disputes under a particular employment contract could not be compelled to arbitration. Id.; 9 U.S.C. § 1.

Relying on Oliveira, plaintiff argues the FAA does not apply to her FCRA claims because they "do not arise out of" the July 2019 TOU, as required by Section 2 of the FAA. (Doc. #64 ("Pl. Opp.") at 24). However, plaintiff's argument is just another way of saying her particular claims are outside the scope of the Arbitration Agreement (which is a question explicitly delegated to the arbitrator, as discussed in Part III supra). Instead, "the enforceability of arbitration provisions under [Sections] 3 and 4 [of the FAA] depends on whether those provisions are 'part of a written . . . contract evidencing a transaction involving commerce' under [Section] 2" but not "certain contracts of employment" that are exempted under Section 1. New Prime v. Oliveira, 139 S. Ct. at 538. The July 2019 TOU is a "contract evidencing a transaction involving commerce" subject to Section 2 of the FAA, and not a contract of employment exempted from Section 1 of the FAA; plaintiff's reliance on Oliveira is thus misplaced.

Accordingly, Section 2 of the FAA applies to plaintiff's claims.

V.      Waiver of Right to Arbitrate

Plaintiff argues EIS has "waived any possible right to seek arbitration through its lengthy and voluntary participation in this litigation, despite knowing of the purported arbitration

15

agreement since the case was filed and waiting more than nine months before any assertion of

any alleged contract to arbitrate." (Pl. Opp. at 8).

The Court disagrees.

A.      Legal Standard

Although there is no bright-line rule, "[t]o determine whether a party has waived its right

to arbitration, a court considers (1) the time elapsed from when litigation was commenced until

the request for arbitration and (2) the amount of litigation to date, including motion practice and

discovery."[9] De Jesus v. Gregorys Coffee Mgmt., LLC, 2022 WL 3097883, at *7 (E.D.N.Y.

Aug. 4, 2022) (quoting LifeTree Trading Pte., Ltd. v. Washakie Renewable Energy, LLC, 764 F.

App'x 105, 107 (2d Cir. 2019) (summary order)).

"Ordinarily a defense of waiver brought in opposition to a motion to compel arbitration is

a matter to be decided by the arbitrator." Meyer v. Uber Techs., Inc., 868 F.3d at 80.  However,

"[w]hen the party seeking arbitration has participated in litigation regarding the dispute, the

district court can properly decide the question of waiver." Id. at 80–81.  For example, when the

"waiver argument is based on defendants' defense of [the] litigation in the district court," it is "a

question for the district court rather than an arbitrator." Id.

---

[9]      In a recent decision, Morgan v. Sundance, the Supreme Court considered the Eighth
Circuit's two-prong waiver test, which examined whether (i) a party knew of its contractual right
to arbitration yet "acted inconsistently with that right"; and (ii) it "prejudiced the other party by
its inconsistent actions."  142 S. Ct. 1708, 1712 (2022).  In Morgan, the Supreme Court
determined that the waiver of arbitration analysis cannot consider prejudice, and remanded the
case to the Eighth Circuit to determine whether the first prong of its traditional test was satisfied.
Id. at 1714.  "Until the Supreme Court's decision in Morgan, the Second Circuit also considered
a third factor—whether there was prejudice to the party that did not move to compel arbitration."
De Jesus v. Gregorys Coffee Mgmt., LLC, 2022 WL 3097883, at *7 n. 6.  "Following Morgan,
the Second Circuit has not ruled on whether a new standard applies to motions to compel
arbitration.  Accordingly, the Court considers the other two elements traditionally used by the
Second Circuit." Id.

B.     Analysis

As a threshold matter, the Court concludes that it may properly consider plaintiff's

litigation waiver argument because it is premised on EIS's actions in litigating the instant

proceedings in this Court.

Regarding the first prong, time elapsed during the litigation, plaintiff commenced this

action on November 4, 2021 (Doc. #1), and EIS filed the instant motion approximately nine

months later on August 15, 2022.  (Doc. #45).  Although there is no per se rule regarding when

delay supports waiver, "[c]ourts have found delays longer than a year . . . not to constitute

waiver."  In re Generali COVID-19 Travel Ins. Litig, 577 F. Supp. 3d 284, 294 (S.D.N.Y. 2021);

see Thyssen, Inc. v. Calypso Shipping Corp., S.A., 310 F.3d 102, 105 (2d Cir. 2002) (collecting

cases finding no waiver for periods of one and a half years and three years).  And delay is just

one factor to be considered; "[i]t is well established that a delay alone cannot support a finding of

waiver in the context of arbitration."  De Jesus v. Gregorys Coffee Mgmt., LLC, 2022 WL

3097883, at *8 (collecting cases and finding "eight-month period between the filing of the

Complaint and Defendants' efforts in seeking arbitration, by itself, is insufficient to support a

finding of waiver").[10]

Regarding the second prong, the amount of litigation to date, plaintiff points to the

discovery she propounded on and obtained from EIS, former defendant Affirm, and non-parties,

and the "considerable time and resources" her counsel spent on such discovery over a period of

six months.  (Singer Decl. ¶ 21).  Plaintiff further states EIS answered the complaint and

---

[10]      Although plaintiff points to the speed with which EIS has filed motions to compel
arbitration in other lawsuits, the waiver analysis must be applied "to the specific context of each
particular case."  La. Stadium & Exposition Dist. v. Merrill, Lynch, Pierce, Fenner & Smith,
Inc., 626 F.3d 156, 159 (2d Cir. 2010).  Accordingly, the Court declines to consider EIS's
actions in other, unrelated litigation.

amended complaint, and participated in court conferences, settlement discussions, and mediation, all without invoking the Arbitration Agreement.  (Pl. Opp. at 12–13).  However, in <u>Morgan v. Sundance, Inc.</u>, the Supreme Court emphasized the waiver analysis "focuses on the actions of the person who held the right" to arbitrate and "seldom considers the effects of those actions on the opposing party."  142 S. Ct. at 1713.  Thus, EIS notes the instant motion is the first substantive motion filed in this case, no depositions have been taken, and EIS solely served one set of interrogatories, requests for production, and requests for admission on plaintiff (and did not serve any discovery on Affirm or non-parties).  (Doc. #69 at 8; Doc. #70 ¶¶ 10, 20, 28, 30–32).

Generally, the Second Circuit "has refused to find waiver in a number of cases where delay in trial proceedings was not accompanied by substantial motion practice or discovery." <u>Sutherland v. Ernst & Young, LLP</u>, 600 F. App'x 6, 7 (2d Cir. 2015) (summary order) (quoting <u>Thyssen, Inc. v. Calypso Shipping Corp., S.A.</u>, 310 F.3d at 104 (collecting cases)).

In addition, filing answers, appearing at mandatory court conferences, and engaging in mediation and settlement do not establish waiver.  <u>See</u> <u>Pierre v. Rochdale Vill. Inc.</u>, 2020 WL 6799635, at *7 (E.D.N.Y. Nov. 19, 2020) (no waiver where motion to compel arbitration was filed one year after lawsuit began, no other substantive motions were filed, no depositions were taken, "only minimal exchange of documents and responses to interrogatories" occurred, and defendant participated in mediation and settlement conference); <u>Henry v. Turner Constr. Co.</u>, 2010 WL 2399423, at *2 (S.D.N.Y. June 14, 2010) ("Merely answering on the merits, appearing at hearings, and participating in discovery, without more, will not necessarily constitute a waiver.").

Accordingly, the Court finds EIS has not waived its right to seek to compel arbitration.

VI.     <u>Stay</u>

EIS requests that the Court stay these proceedings pending the arbitration.

"The district court must stay proceedings once it is satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." <u>Nicosia v. Amazon.com, Inc.</u>, 834 F.3d at 229.

Because the Court determines the parties agreed to arbitrate, the litigation must be stayed.

**CONCLUSION**

The motion to compel arbitration and stay this action is GRANTED.

The parties are ORDERED to arbitrate their dispute.

This action is STAYED pending arbitration.

The Clerk is instructed to terminate the motion.  (Doc. #45).

The Clerk is further instructed to administratively close this case, without prejudice to either party moving by letter motion to reopen the case within thirty days of the conclusion of the arbitration proceedings.[11]

Dated:  March 13, 2023
        White Plains, NY

                                        SO ORDERED:

                                        _____
                                        Vincent L. Briccetti
                                        United States District Judge

---

[11]     See <u>Zimmerman v. UBS AG</u>, 789 F. App'x 914, 915–16 (2d Cir. 2020) (summary order) ("The district court's administrative closure of the case does not constitute a final decision:  there is no jurisdictional significance to a docket entry marking a case as 'closed,' which we will assume was made for administrative or statistical convenience.").